1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| LENA ARMAS and ANDREA BLUM, individually and on behalf of all others similarly situated, | Case No.  _____ |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| | **DEMAND FOR JURY TRIAL** |
| REALPAGE, INC., GREYSTAR REAL ESTATE PARTNERS, LLC,  CH REAL ESTATE SERVICES, LLC, LINCOLN PROPERTY CO., FPI MANAGEMENT, INC., MID-AMERICA APARTMENT COMMUNITIES, INC., AVENUE5 RESIDENTIAL, LLC, EQUITY RESIDENTIAL, ESSEX MANAGEMENT CORPORATION, AVALONBAY COMMUNITIES, INC., CAMDEN PROPERTY TRUST, ESSEX PROPERTY TRUST, INC., THRIVE COMMUNITIES MANAGEMENT, LLC, SECURITY PROPERTIES INC., B/T WASHINGTON, LLC d/b/a BLANTON TURNER, INDEPENDENCE REALTY TRUST, INC., CUSHMAN & WAKEFIELD, INC., BH MANAGEMENT SERVICES, LLC, and UDR, INC., | |
| Defendants. | |

CLASS ACTION COMPLAINT - 1
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ............................................................ 1

II.   PARTIES ...................................................................................... 5

III.  JURISDICTION AND VENUE ..................................................... 11

IV.   FACTUAL ALLEGATIONS .......................................................... 11

    A.    Historical Competition Among Residential Property Managers ........................ 11

    B.    RealPage And AI Revenue Management ............................................. 13

    C.    Property Managers Who Adopted The RealPage Platform Did So With The Common Goal Of Raising Rent Prices .................................. 18

    D.    The Conspiracy Cause Inflated Rental Prices And Reduced Occupancy Of Residential Rental Units ............................................ 20

    E.    "Plus Factors" In The Residential Market Provide Additional Evidence Of A Price Fixing Conspiracy ........................................... 21

V.    CLASS ALLEGATIONS ............................................................... 24

VI.   ANTITRUST INJURY .................................................................. 27

VII.  FRAUDULENT CONCEALMENT ................................................ 27

COUNT I  VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) .................................................................................. 29

COUNT II  VIOLATIONS OF NORTH CAROLINA GENERAL STATUTES §§ 75-1 *ET SEQ.* .............................................................. 30

COUNT III  VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), FLA. STAT. § 501.201 *ET SEQ.* ........................................................................................ 31

PRAYER FOR RELIEF .......................................................................... 32

JURY TRIAL DEMAND ........................................................................ 33

CLASS ACTION COMPLAINT  - i
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Plaintiffs Lena Armas and Andrea Blum ("Plaintiffs") bring this case, individually and on behalf of all others similarly situated, against Defendants RealPage, Inc., Greystar Real Estate Partners, LLC, CH Real Estate Services, LLC,  Lincoln Property Co., FPI Management, Inc., Mid-America Apartment Communities, Inc., Avenue5 Residential, LLC, Equity Residential, Essex Management Corporation, AvalonBay Communities, Inc., Camden Property Trust, Essex Property Trust, Inc., Thrive Communities Management, LLC, Security Properties Inc., B/T Washington, LLC d/b/a Blanton Turner, Independence Realty Trust, Inc., Cushman & Wakefield, Inc., BH Management Services, LLC, and UDR, Inc. (collectively, "Defendants" or "Lessors").  Plaintiffs makes the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge.

## I.     NATURE OF THE ACTION

1.     This is an antitrust class action alleging that certain major residential landlords illegally exchanged and agreed on prices through a data analytics software rather than compete to attract renters.  Defendants are RealPage, Inc. ("RealPage"), the developer of a software platform called "AI Revenue Management" (previously known as "YieldStar") (hereafter, "RealPage Platform" or "YieldStar"), and several managers of large-scale residential apartment buildings that used the RealPage Platform to coordinate and agree upon rental housing pricing, among other things, throughout the United States.

2.     The RealPage Platform works by collecting vast amounts of non-public data from its client property managers regarding lease transactions, rent prices, occupancy levels, and virtually every other possible data point relevant to rent prices.  This data is fed into an algorithm, along with additional data collected from RealPage's myriad other data analytics and rental management software products.  The algorithm then generates a rental price for each of RealPage's client's available units, which is updated daily.  RealPage makes sure all of its clients know that to maximize revenues, they must accept the software's rental price at least 80-90 percent of the time, and RealPage's "Revenue Management Advisors" monitor clients to ensure compliance.  As the allegations and evidence set forth below demonstrate, RealPage and the

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

property managers who use the RealPage Platform constitute a price-fixing cartel, and the revenue growth they have achieved is possible only through coordinated price setting.

3.     Before 2016, the Lessors assessed and priced multifamily residential property leases per their own assessments of the market.  This is done in a manner that maximizes occupancy, with an added incentive to maintain healthy competition among Lessors by luring renters with competitive pricing.  Prior to the collusive conduct, decisions to put leases on the market were independently taken, resulting in the natural play of competitive market forces.

4.     In or around 2016, Defendants replaced these independent pricing and supply decisions with collusion.  With its growing popularity within the industry, Lessors agreed to use the RealPage Platform.  Defendants agreed to follow RealPage Platform's rental pricing recommendations 80-90 percent of the time and faced disciplinary action for non-compliance based on the expectation that competing Defendants would do the same.

5.     With the assurance that other cartel members are setting prices using the same algorithm, property managers can allow a larger share of their units to remain vacant while maintaining higher rental prices across their properties, and thereby obtain greater revenue.  This strategy is only effective because of the pricing coordination among competing property managers enabled by this cartel, which is why RealPage repeatedly and explicitly emphasizes that for the software to work properly, everyone needs to accept its suggested price at least 80-90 percent of the time.  Indeed, while "Apartment managers can reject the software's suggestions, [] as many as 90% are adopted," according to former RealPage employees.[1]

6.     Before the introduction of coordinated rent-setting software, residential property managers generally set prices, independently, to maximize occupancy.  Allowing apartments to stand vacant at their advertised rental prices made little sense when similar apartments in the area were available for less.  Thus, in the past, property managers had an incentive to lower rents until all available units were occupied.  Allowing apartments to sit, unoccupied, was not a profitable

---

[1] Heather Vogell, *Rent Going Up?  One Company's Algorithm Could Be Why*, ProPublica (Oct. 15, 2022).

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

strategy unless there was some assurance or expectation that other property managers would similarly allow their units to remain vacant without lowering rents. The RealPage Platform provides such an assurance.

7.      Beyond the anticompetitive exchange of nonpublic and competitively sensitive information among competing property managers, RealPage uses additional mechanisms to facilitate coordination among cartel members and prevent cheating by conspiracy participants. First, by allowing property managers to outsource their rent-setting process, RealPage causes them to consider higher rent prices than they ever would have before. In the words of an executive at one of RealPage's major clients: "The beauty of YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it."[2]

8.      Second, RealPage polices cartel members by applying heavy pressure on them to accept the algorithms suggested price at least 80-90 percent of the time. The RealPage Platform service includes more than its rent-setting algorithm. Clients can expect constant communication with one or more of RealPage's Revenue Management Advisors who provide "expert oversight of [clients'] pricing strategy."[3] Any client property manager who chooses to diverge from the algorithm's price is expected to provide justification to a Revenue Management Advisor.

9.      Third, the RealPage Platform also recommends lease renewal dates for its clients' properties. Using RealPage's vast store of data on lease transactions, the algorithm suggests dates that are staggered to avoid temporary periods of oversupply resulting from the natural ebb and flow of the market.[4] This further reduces the incentive for property managers to undercut would-be competitors, which is the strongest during these temporary oversupply periods.

10.      Fourth, RealPage facilitates direct information exchanges between competitors and provides opportunities for direct coordination of prices. It hosts online forums, organizes in-

---

[2] *Id.* (quoting Kortney Balas, director of revenue management at JVM Realty).

[3] *RealPage AI Revenue Management*, RealPage, Inc., https://www.realpage.com/asset-optimization/revenue-management/ (last accessed Nov. 21, 2022).

[4] *Revenue Management: Proven in Any Market Cycle*, RealPage eBook at 3 (2020), https://www.realpage.com/ebooks/outperform-in-a-down-market/.

CLASS ACTION COMPLAINT - 3
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

person events for its clients, and maintains standing committees of cartel members to advise on pricing strategy.[5]

11.     As the property managers acknowledge, they are competitors.  Yet, RealPage's clients shared a common goal of increasing rent prices across the board and understood that RealPage—which has been explicit that its aim is to help its clients "outperform the market [by] 3% to 7%"—was the means by which to do it.[6]  RealPage's clients include many of the nation's largest property managers who often control a majority of rental units in desirable neighborhoods of major cities.  A recent analysis conducted by ProPublica showed that rents in areas where RealPage clients control a high percentage of rental units have increased at a significantly higher rate than those where the company's influence is weaker.[7]

12.     Even though one Lessor's "turnover rates increased about 15 percentage points in 2006 after it implemented YieldStar," according to the company's CEO.[8]  However, this "wasn't a problem for the firm: Despite having to replace more renters, its revenue grew by 7.4%."[9]  The CEO of that Lessor company also noted that "[t]he net effect of driving revenue and pushing people out was $10 million in income."[10]

13.     In a video "touting the company's services," a vice president of RealPage stated that "[a]partment rents had recently shot up by as much as 14.5%."[11]  And when asked "[w]hat role the [RealPage] software played" in this astronomic rise, another RealPage executive answered: "I think it's driving it, quite honestly."[12]

---

[5] *See User Group Overview*, RealPage, Inc., https://www.realpage.com/user-group/overview/ (last accessed Nov. 21, 2022); *see also RealWorld 2022: The Pursuit of Excellence*, RealPage, Inc., https://www.realpage.com/realworld/ (last accessed Nov. 21, 2022).

[6] Vogell, *supra* note 1 (citing a RealPage webpage that has since been removed).

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* (quoting Jay Parsons, a vice president of RealPage).

[12] *Id.* (quoting Jay Parsons' conversation with Andrew Bowen, a RealPage executive).

CLASS ACTION COMPLAINT - 4
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

14.     Defendants' price fixing conspiracy is a *per se* unlawful restraint of trade under Section 1 of the Sherman Act.  It has resulted in artificially inflated rent prices and a diminished supply of affordable rental units.  As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Class, who rent in residential markets throughout the United States from property managers that use RealPage's software, paid significant overcharges on rent and suffered harm from the reduced availability of rental units they could reasonably afford.  Plaintiffs bring this action to recover their damages, as well as injunctive and other appropriate relief, on behalf of all others similarly situated.

## II.     PARTIES

15.     Plaintiff Lena Armas is a resident of Charlotte, North Carolina.  She rented a multifamily residential unit in a property known as 1100 South in Charlotte, NC from September 2020 through September 2021.  Lessor Greystar Real Estate Partners, LLC managed this property using the RealPage Platform.  As a result of the rental increase, Ms. Armas terminated her lease, and moved into a property known as Mercury NoDa in Charlotte, NC.  Lessor CH Real Estate Services, LLC manages the Mercury NoDa property using the RealPage Platform.  Ms. Armas paid higher rental prices as a result of the antitrust violations at issue here.

16.     Plaintiff Andrea Blum is a resident of Boca Raton, Florida.  During the relevant period, Ms. Blum rented a multifamily residential unit in Delray Beach, Florida.  Lessor Greystar Real Estate Partners, LLC managed this property.  Using the RealPage Platform, Greystar increased Ms. Blum's rent each year, including an approximately $610 rent increase in 2022.  Ms. Blum paid higher rental prices as a result of the antitrust violations at issue here.

17.     **Defendant RealPage** is a Delaware corporation headquartered in Richardson, Texas.  It has nearly 31,700 customers that together control the critical mass of rental real estate in the United States.  RealPage has thousands of employees and earns over a billion dollars per year in revenue.  The RealPage Platform is used by property managers, including Lessors across Washington.  RealPage was a public company from 2010 until December 2020, when it was purchased by private equity firm Thomas Bravo in a transaction that valued RealPage at approximately $10.2 billion.  The RealPage Platform has encouraged and enabled Lessors to

CLASS ACTION COMPLAINT - 5
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

artificially raise the rental prices of their multifamily residential property leases.

18.     **Lessor Defendant Greystar Real Estate Partners, LLC ("Greystar")** is a Delaware limited liability corporation headquartered in Charleston, South Carolina.  A significant RealPage client, it is the largest manager of multifamily rental real estate in the United States and manages over 782,900 multifamily units and student beds nationally. RealPage has used Greystar's success in the leasing market as a case study on several occasions across its website.[13]  Greystar earns billions of dollars per year in revenue, controls 35.5 billion dollars in assets, and employs over 20,000 people.  It has a history of large acquisitions of privately owned apartment management companies, and now controls hundreds of buildings in metro areas where rents have risen exorbitantly in recent years.[14]  Greystar uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

19.     **Lessor Defendant CH Real Estate Services, LLC** ("Carter-Haston") is Delaware Limited Liability corporation headquartered in Nashville, Tennessee.  It is a privately owned real estate firm involved in real estate investment, property management, and leasing worldwide.  Carter-Haston manages approximately 21,000 multifamily rental units in the United States.  Carter-Haston uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

20.     **Lessor Defendant Lincoln Property Co. ("Lincoln")** is a Texas corporation headquartered in Dallas, Texas.  It is a privately owned real estate firm involved in real estate investment, development, property management, and leasing worldwide.  It is the second largest manager of multifamily rental real estate in the United States, and its cumulative development efforts have produced over 130 million square feet of commercial space and over 212,000 multifamily residential units.  Lincoln uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

---

[13] *See Search Results for Greystar*, RealPage, https://www.realpage.com/search/?query=greystar (last accessed Nov. 21, 2022).

[14] Wendy Broffman, *Game Changer*, YIELDPRO, https://yieldpro.com/2014/08/game-changer/ (last accessed Nov. 21, 2022).

21.     **Lessor Defendant FPI Management, Inc. ("FPI")** is a California corporation headquartered in Folsom, California.  FPI is the fifth largest manager of multifamily rental real estate in the United States, with over 150,000 multifamily units under management in 17 states. FPI uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

22.     **Lessor Defendant Mid-America Apartment Communities, Inc. ("MAA")** is a Tennessee corporation headquartered in Germantown, Tennessee.  MAA is the tenth largest manager of multifamily rental real estate in the United States.  As of December 31, 2020, the company owned 300 apartment communities containing 100,490 apartment units.  MAA uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

23.     **Lessor Defendant Avenue5 Residential, LLC ("Avenue5")** is a Delaware limited liability company headquartered in Seattle, Washington.  Avenue5 is the twelfth largest manager of multifamily rental real estate across the United States, with over 96,900 multifamily units under management in 12 states.  Avenue5 earns over 500 million dollars per year in revenue and employs over 1,000 people.  Avenue5 uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

24.     **Lessor Defendant Equity Residential ("Equity")** is a Maryland real estate investment trust headquartered in Chicago, Illinois.  Equity is the sixteenth largest manager of multifamily rental real estate in the United States.  As of December 31, 2021, the company owned or had investments in 310 properties consisting of 80,407 apartment units in Southern California, San Francisco, Washington D.C., New York City, Boston, Seattle, Denver, Atlanta, Dallas/Fort Worth, and Austin.  Equity earns over 2 billion dollars per year in revenue and employs over 2,000 people.  Equity uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

25.     **Lessor Defendant Essex Property Trust, Inc.** is a Maryland corporation headquartered in San Mateo, California.  **Lessor Defendant Essex Management Corporation** (together with Lessor Defendant Essex Property Trust, Inc., **"Essex"**) is a California corporation

CLASS ACTION COMPLAINT - 7
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

with its headquarters in San Mateo, California.  Essex is a residential apartment manager with over 61,000 rental units under its management.  Essex uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

26.     **Lessor Defendant AvalonBay Communities, Inc. ("AvalonBay") is** a Maryland corporation headquartered in Arlington, Virginia.  AvalonBay owns and operates apartment buildings around the country that utilize the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

27.     **Lessor Defendant Camden Property Trust ("Camden") is** a Texas real estate investment trust headquartered in Houston, Texas.  Camden is a residential apartment manager with over 58,000 rental units under its management.  Camden uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

28.     **Lessor Defendant Thrive Communities Management, LLC ("Thrive") is** a Washington limited liability company headquartered in Seattle, Washington.  Thrive has over 18,000 units under management in the greater Pacific Northwest.  Thrive earns millions of dollars per year in revenue and employs over 500 people.  Thrive uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

29.     **Lessor Defendant Security Properties Inc. ("Security Properties") is** a Washington corporation headquartered in Seattle, Washington.  Security Properties has over 22,000 units under management in 18 states.  Security Properties earns millions of dollars per year in revenue.  Security Properties uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

30.     **Lessor Defendant B/T Washington, LLC d/b/a Blanton Turner ("Turner") is** a Washington limited liability company headquartered in Seattle, Washington.  Turner is a residential apartment manager with over 5,300 rental units under its management.  Turner uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

31.     **Lessor Defendant Independence Realty Trust, Inc. ("Independence") is** a Maryland real estate investment trust headquartered in Philadelphia, Pennsylvania.

CLASS ACTION COMPLAINT - 8
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Independence is a residential apartment manager with over 36,000 rental units under its management.  Independence uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

32. **Lessor Defendant Cushman & Wakefield, Inc. ("Cushman")** is a Delaware corporation headquartered in New York, New York.  It is the third largest commercial real estate services firm in the world.  Its subsidiary, Pinnacle Property Management Services, LLC ("Pinnacle") is headquartered in Addison, Texas.  Pinnacle has more than 4,500 employees who manage apartment communities in 32 states, Washington D.C., and Canada.  Pinnacle President and CEO, Rick Graf, has discussed how using the RealPage Platform has allowed Pinnacle to outperform its competitors during down market cycles: "Initially, skeptical about RealPage Revenue Management's ability to outperform during down market cycles, Graf was pleasantly surprised to experience the opposite outcome[,] a 4% revenue lift when the market took a severe dive that left many owner/operators without RealPage making concessions that proved detrimental to their profitability."[15]  Cushman as well as Pinnacle use the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

33. **Lessor Defendant BH Management Services, LLC ("BH")** is a Florida limited liability company headquartered in Des Moines, Iowa.  BH manages over 100,000 units and employs 2,600 people across the country.  BH has discussed using the RealPage Platform successfully to allow insight into what its competitors' pricing decisions and how to avoid "subjectively adjusting to what the market is doing."[16]  BH uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

34. **Lessor Defendant UDR, Inc. ("UDR")** is a Maryland corporation headquartered in Highlands Ranch, Colorado.  UDR has 53,229 units in 160 communities located in 21

---

[15] *Rick Graf, Pinnacle CEO, on RealPage Revenue Management's 4% Revenue Lift*, RealPage, https://www.realpage.com/videos/rick-graf-pinnacle-yieldstar-revenue-lift/ (last accessed Nov. 21, 2022).

[16] Tim Blackwell, *Six Ways Revenue Management Software Benefits B and C Properties*, RealPage (June 12, 2019), https://www.realpage.com/blog/six-ways-revenue-management-software-benefits-b-c-properties/ (last accessed Nov. 21, 2022).

CLASS ACTION COMPLAINT - 9
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

markets under management in the United States.  It is the 19th largest owner of apartments in the United States and the 30th largest apartment property manager in the United States.  UDR uses the RealPage Platform to artificially raise the rental prices of its multifamily residential property leases.

35.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

36.     Each Defendant acted as an agent for each other with respect to the acts and violations alleged herein.

37.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as agents with the Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance of misconduct and concealment alleged herein.

38.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

39.     Plaintiffs and the Class were harmed by Defendants' misconduct and concealment.  Defendants are responsible for the harm because RealPage aided and abetted the Lessor Defendants in committing the misconduct and concealment.

40.     Although RealPage is responsible for creating and selling the RealPage Software, the Lessor Defendants are responsible for using it and implementing the prices set forth by the software algorithm.  The Lessor Defendants are responsible because they were aware that the

CLASS ACTION COMPLAINT - 10
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

RealPage Platform was intended to raise rental prices of multifamily residential property leases and reduce the supply of them.  Nevertheless, the Lessor Defendants employed the RealPage Platform, thereby showing that they had the specific intent to facilitate the misconduct that RealPage undertook.

### III.   JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

42.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and Washington's long-arm statute.

43.     This Court has venue in this District under Section 22 of the Clayton Act, 15 U.S.C. § 22, and the federal venue statute, 28 U.S.C. § 1391, because one or more Defendants maintain business facilities, have agents, transact business, or are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

### IV.   FACTUAL ALLEGATIONS

**A.     Historical Competition Among Residential Property Managers**

44.     Before the introduction of software like YieldStar, competition in the rental housing market was driven by property managers' desire to keep occupancy levels in their buildings as high as possible and to keep turnover among their tenants down.[17]  In addition to lost rent revenue caused by letting apartments sit empty, the costs of owning and maintaining a rental apartment are not significantly different whether the unit is occupied or not.  This provides a strong incentive for property managers to lower their rents to fill vacant units.  While property managers knew in theory that if they all resisted this temptation, they would all benefit from

---

[17] *See, e.g., Proven in any Market Cycle: See How These Companies Outperformed During Downturns* at 3, RealPage eBook (2020), https://www.realpage.com/ebooks/outperform-in-a-down-market/.

CLASS ACTION COMPLAINT - 11
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   higher average rents, any individual property manager that lowered its rents to fill vacancies

2   while the others did not would be able to gain market share at the others' expense.

3       45.     As Donald Davidoff, the principal developer of competing price-setting software

4   that RealPage acquired in 2017, explained in a 2020 blog post: "All [property managers] would

5   be better off limiting their rent reductions; however, should one property manager lower their

6   rents while the others don't, then that operator would outperform.  The result can be a race to the

7   bottom that is not good for anyone, but the fear of missing out coupled with laws prohibiting

8   collusion make this the most likely outcome."[18]  This so-called "race to the bottom" might be

9   bad for all property managers but is, of course, good for renters.  It represents nothing beyond

10  healthy price competition.

11      46.     Absent collusion, property managers could not unilaterally raise rents above

12  market rates—any property manager that did so would lose tenants to its competitors who

13  offered rental units at market rates, granting them a higher share of the available profits.  This

14  dynamic causes rental prices in a competitive marketplace to be sensitive to changes in demand.

15  For example, rents have historically gone up quickly in neighborhoods that become trendy, or

16  when new public transportation infrastructure is added, and have fallen in areas where businesses

17  close, or that new generations find less desirable than previous ones did.  Any number of factors

18  that made people want to live in a certain area or a certain type of apartment could cause rents to

19  rise or fall accordingly.  Rents were also historically responsive to changes in renters' average

20  income.

21      47.     As described more fully below, Defendants' conspiracy avoids a race to the

22  bottom, but it does so at the financial expense of their customers—the renters.  It allows property

23  managers to hike rents at a faster pace when demand is strong without needing to lower them

24  when it is weak.  It eases natural competitive constraints and causes renters to spend higher and

25  higher portions of their incomes on housing.

26

27      [18] Donald Davidoff, *They're Heckling Revenue Management Again*, The Demand Solutions
    Blog (Aug. 18, 2020), https://www.d2demand.com/mfhblog/theyre-heckling-revenue-
28  management-again (last accessed Nov. 22, 2022).

CLASS ACTION COMPLAINT - 12
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1

**B.**      **RealPage And AI Revenue Management**

2        48.     RealPage markets a "comprehensive platform of data analytics and on demand

3   software solutions and services for the rental real estate industry."[19]  Its clients are managers of

4   residential rental apartments, to which it offers an array of products for (1) marketing and leasing

5   of apartments, (2) resident experience (including IT portals and rent payment software), (3) site

6   management, (4) vendor and expense management, (5) budgeting and investment, (6)

7   accounting, (7) data analytics, and (8) so-called "revenue management" —advisory services on

8   how to obtain higher rents on every unit.  This "revenue management" service is the fulcrum of

9   Defendants' anticompetitive scheme.

10        49.     RealPage was founded in 1998, and in 2002 it acquired the original YieldStar

11  software from Defendant Camden Property Trust, a large real estate investment trust and

12  manager of apartment buildings.[20]  Two years later, the company hired Jeffery Roper as its

13  principal scientist to improve YieldStar's performance and grow its client base.[21]  Roper saw

14  potential in the software as a means for RealPage's customers to increase their revenue by

15  maintaining higher average rents, but he realized that to function properly, the algorithm needed

16  huge amounts of detailed data regarding rent prices and occupancy of individual units.[22]

17  RealPage began collecting information from its clients and other sources in a "data warehouse,"

18  which the algorithm could mine.  Beyond rent prices and occupancy rates, this data included

19  records of actual lease transactions, signed lease documents, lease renewal dates, records of rent

20  payments, and detailed data on tenants and their finances.

21

22

23

24        [19] RealPage Inc., *Annual Report (Form 10-K)* at 6 (Mar. 1, 2021),
     https://sec.report/Document/0001286225-21-000007/ (last accessed Nov. 22, 2022).

25        [20] Press Release, *RealPage Acquires YieldStar Multifamily Revenue Management System*,

26  RealPage Inc. (July 19, 2002), https://www.realpage.com/news/realpage-acquires-yieldstar-
     multifamily-revenue-management-system/ (last accessed Nov. 22, 2022).

27        [21] *See* Vogell, *supra* note 1.

28        [22] *See id.*

50.     Roper had previously helped design similar price-setting software for Alaska Airlines that also facilitated information exchange and price-fixing, according to the DOJ.[23] During his tenure as director of revenue management, Alaska Airlines and its competitor airlines began using common software to exchange information regarding planned routes and ticket prices among themselves before that information became public.[24]  The software allowed the airlines to avoid price wars that would have lowered ticket prices.  The Justice Department's Antitrust Division filed suit against eight of the largest U.S. airlines, alleging that the software-enabled information exchange amounted to anticompetitive price fixing under the antitrust laws.[25]  A government economist calculated that the scheme cost consumers up to 1.9 billion dollars.[26]  All eight airlines eventually entered into consent decrees requiring them to eliminate the information exchange features of the software that had enabled the conspiracy.[27]  At one point during the investigation, federal agents removed a computer and documents from Roper's office at Alaska Airlines.[28]

51.     Much like the airlines' price-fixing cartel, Defendants' cartel avoids price wars and the "race to the bottom" during periods of oversupply.  As RealPage declares to potential clients in its advertising materials: "You don't have to sacrifice rent growth during a softening market."[29]

---

[23] Press Release, *Justice Department Settles Airlines Price Fixing Suit, May Save Consumers Hundreds of Millions of Dollars*, U.S. Dep't of Just. (Mar. 17, 1994), https://www.justice.gov/archive/atr/public/press_releases/1994/211786.htm (last accessed Nov. 22, 2022).

[24] Vogell, *supra* note 1.

[25] Press Release, *Justice Department Files Price Fixing Suit Against Eight Airlines and Fare Dissemination System*, U.S. Dep't of Just. (Dec. 21, 1992), https://www.justice.gov/archive/atr/public/press_releases/1992/211323.htm (last accessed Nov. 22, 2022).

[26] DOJ Press Release, *supra* note 23.

[27] DOJ Press Release, *supra* note 23.

[28] Vogell, *supra* note 1.

[29] RealPage Inc., *Proven in any Market Cycle*, *supra* note 17.

52.     Naturally, the RealPage Platform's coordinated pricing strategy became more and more effective as more property managers implemented it.  To this end, RealPage began buying up similar and competing software companies, and it has completed 25 acquisitions since its founding.[30]  The most important of these transactions came in 2017, when RealPage acquired Lease Rent Options ("LRO"), a company which offered similar rent-setting software that was the RealPage Platform's strongest rival.  Instead of relying on nonpublic data from competitors, however, LRO's algorithm used only public market data as input.  LRO's chief architect, Donald Davidoff, designed it that way specifically to avoid the potential antitrust violations arising from the use of nonpublic data to coordinate prices among competitors.[31]

53.     LRO's software was not the most valuable piece of the acquisition for RealPage, however—its customer base was.  At the time of the merger, RealPage was pricing 1.5 million units.  That number doubled with the acquisition.[32]  RealPage rebranded the product AI Revenue Management, and its client base and influence on rental markets in urban areas across the country continued to grow.  RealPage's website currently claims that its clients use AI Revenue Management to set the price for more than 4 million rental units.[33]  While the DOJ issued a so-called "Second Request" in connection with the proposed merger due to its potential effects on competition, DOJ took no further action, and RealPage completed the acquisition.[34]

54.     These 4 million units provide only a piece of the data available for RealPage's algorithm to mine, however.  According to RealPage's last annual report before being acquired by Thomas Bravo, as of December 31, 2020, its "client base of over 31,700 clients used one or

---

[30] Tracxn, *Acquisitions by RealPage* (Oct. 24, 2022), https://tracxn.com/d/acquisitions/acquisitionsbyRealPage (last accessed Nov. 22, 2022).

[31] Vogell, *supra* note 1.

[32] *Id.*

[33] *RealPage AI Revenue Management*, RealPage, Inc., https://www.realpage.com/asset-optimization/revenue-management/ (last accessed Nov. 22, 2022).

[34] Vogell, *supra* note 1.

more of [its] integrated data analytics or on demand software solutions to help manage the operations of approximately 19.7 million rental real estate units."[35]

55.     RealPage's vast client base provides it with real-time data on every aspect of the rental housing market, including actual rent prices as opposed to advertised rents—data which was previously unavailable to landlords.  RealPage advertises that the algorithm "crunches **millions of transactions each night**, pinpointing price shifts for **every single unit** on the platform at any point in time."[36]

56.     Below is a diagram from an eBook published by RealPage on its website.[37]  It demonstrates how RealPage aggregates the data (including nonpublic lease transaction data) which enables RealPage to coordinate pricing among its clients:



57.     By enabling property managers to outsource lease pricing decisions to the software, RealPage has transformed rental markets.  Where lease prices were formerly set to maximize occupancy rates, increasing revenue on individual rental units has become the driving force.  David Hannan, senior vice president at the Morgan Group, a Houston-based property manager, which grew revenue five percent above expectations when it implemented YieldStar,

---

[35] *See* RealPage Inc., *Annual Report (Form 10-K)* at 14, *supra* note 19.

[36] *YieldStar Calculates the Right Rent Price at the Right Time*, RealPage Videos, https://www.realpage.com/videos/yieldstar-measures-price-elasticity/ (last accessed Nov. 22, 2022).

[37] *3 Ways to Leverage AI for Maximum NOI* at 8, RealPage eBook (2022), https://www.realpage.com/ebooks/leverage-ai-maximum-noi/.

CLASS ACTION COMPLAINT - 16
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

characterized the transformation like this: "My generation grew up worshipping the occupancy gods.  We learned that if you were not 95 percent-plus occupied, the asset was failing.  But that's not necessarily true anymore . . . this totally turns the industry upside down."[38]  RealPage characterizes this transformation as a shift from an "occupancy focus" to "rent growth focus."[39]

58.   Other traditional aims for a healthy rental property, such as low turnover rates, have also been abandoned.  Ric Campo, the CEO of Camden Property Trust, a national real estate investment trust, said his turnover rates increased around 15 percentage points in 2006 after implementing YieldStar.  Despite that increase in turnover rates, Camden Property Trust's overall same-property revenue grew over seven percent in its first year using YieldStar.  "What we found," Campo said, "was that driving our turnover rate up actually captured additional revenue."  While Camden Property Trust's turnover expenses increased by $2.5 million, revenue increased $12.5 million.  According to Campo, "[T]he net effect of driving revenue and pushing people out was $10 million in income."[40]

59.   Additionally, RealPage provides its customers with real-time information about their competitors sufficient to avoid oversupply of units caused by natural ebbs and flows in the market.  The algorithm uses the occupancy data it collects to recommend lease renewal dates that are staggered to avoid any period of oversupply.  Property managers can then hold units vacant for a period, while keeping rent prices inflated.[41]  This strategy of staggering of lease renewal dates smooths out natural fluctuations of supply and demand, which further reduces any incentive for Defendants and their co-conspirators to undercut their inflated prices.  This incentive is always the greatest in periods of oversupply, when falling revenues could be replaced by achieving full occupancy at reduced prices.

---

[38] Joe Bousquin, *In the Back Office, Revenue Management Software is Causing a Revolution*, Multifamily Executive (Apr. 20, 2009), https://www.multifamilyexecutive.com/technology/in-the-back-office-revenue-management-software-is-causing-a-revolution_o (last accessed Nov. 22, 2022).

[39] RealPage Inc., *Proven in any Market Cycle*, *supra* note 17.

[40] Bousquin, *supra* note 38.

[41] *See* RealPage Inc., *Proven in any Market Cycle*, *supra* note 17.

Hagens Berman Sobol Shapiro LLP
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**C.      Property Managers Who Adopted The RealPage Platform Did So With The Common Goal Of Raising Rent Prices**

60.     Property managers who use the RealPage Platform do so with the explicit and common goal of increasing rents for all members of the cartel by using coordinated algorithmic pricing.  RealPage advertises that its customers "outperform the market by 2%-7% year over year,"[42] by switching from an "occupancy focus" to a "rent growth focus."[43]  RealPage's clients find its revenue management services particularly helpful because those services allow the property managers to "make sure we're limiting our supply when there isn't too much demand."[44]  As one property manager described in a promotional video on RealPage's website, YieldStar takes on the burden of "implementing the increases in rents . . . it's running the lease expiration for us and we're not manually doing it which means we're increasing our revenue for those units."[45]

61.     To join the cartel, property managers must agree to abide by certain conditions. They must provide RealPage with real-time access to detailed, nonpublic data regarding their residential leases.  They must agree to outsource daily pricing and ongoing revenue oversight to RealPage.  Importantly, they agree to rent their units at the algorithm's recommended price, even where it is higher than they would have previously considered.  While it is possible for property managers to reject the algorithm's suggested price for a given unit, RealPage uses multiple

---

[42] *Introducing AI Revenue Management: Next-Generation Price Optimization That Unlocks Hidden Yield*, RealPage Inc. (2020) https://www.realpage.com/storage/files/pages/pdfs/2021/02/ai-revenue-management-lookbook-nov20.pdf (last accessed Nov. 22, 2022).

[43] *See* RealPage Inc., *Proven in any Market Cycle*, *supra* note 17.

[44] *RealPage Revenue Management Maximizes Market Opportunity*, RealPage Video (Dec. 2, 2019), https://www.realpage.com/videos/revenue-management-maximizes-market-opportunity/ (interview with John Kirchmann, CFO of IRET Property Management) (last accessed Nov. 22, 2022).

[45] *YieldStar™ Revenue Management Optimizes Rent Pricing*, RealPage Videos (Sept. 10, 2019), https://www.realpage.com/videos/yieldstar-optimizes-rent-pricing/ (testimonial of Holly Casper, Vice President of Operations for RKW Residential) (last accessed Nov. 22, 2022).

mechanisms to enforce what it refers to as pricing "discipline" or "courage."  The result is that property managers adopt at least 80 percent and as much as 90 percent of suggested rates.[46]

62.     RealPage provides participating property managers with daily recommended rents for available rental units.  The property manager must either accept these rates or provide justification to a RealPage Revenue Management Advisor for their divergence from the recommended price.  And, according to a former RealPage executive, property managers only ever offered minimal pushback on the recommended rates.[47]

63.     Unlike renters, RealPage's customers (the property managers) are fully aware when they sign up that the higher rents achieved by using the algorithm are the result of coordinated pricing among competing property managers.  Before the introduction of rent-setting software, markets for residential leases were characterized by a prisoner's dilemma.  While higher rents across the board would benefit all landlords, one self-interested landlord could outperform the rest by undercutting the price and achieving full occupancy.  Without assurances that competitors will refrain from undercutting rent prices, individual landlords are forced to price their units to maximize occupancy.

64.     By enforcing price discipline and setting rents that result in lower occupancy rates, RealPage provides assurances that all property managers using its software are doing the same thing—raising rents and accepting lower occupancy instead of lowering the price to fill units.  In this way, RealPage enables property managers to overcome the prisoner's dilemma that prevented coordinated pricing in the historical market for residential rental apartments.[48]

65.     RealPage's clients are also aware that the rent growth they achieve is based on real-time sharing of nonpublic lease transaction and pricing data.  RealPage calls this information exchange "continuous optimization through connected intelligence" and brags that it is "[b]uilt

---

[46] *See* Vogell, *supra* note 1.

[47] *See id.*

[48] *See* Salil K. Mehra, *Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels*, 26 Stan. J.L. Bus. & Fin. 171, 197-203 (2021).

on the market's largest real-time data set."[49]  Coordinated algorithmic pricing allows property managers to, in RealPage's own words, "outsource daily pricing and ongoing revenue oversight" to RealPage, allowing RealPage to set prices for client property managers' properties "as if we [RealPage] own them ourselves."  Put differently, the software allows the independent property managers to operate as if they were one company setting prices.

### D.    The Conspiracy Cause Inflated Rental Prices And Reduced Occupancy Of Residential Rental Units

66.    RealPage's model works to increase revenue by raising rent prices while accepting lower occupancy levels.  RealPage has not been shy about this mechanism of action.  During a 2017 earnings call, then-CEO of RealPage Steve Winn offered as an example one large property company, managing over 40,000 units, which learned it could make more profit by operating at a lower occupancy level that "would have made management uncomfortable before."[50]  Prior to adopting YieldStar, the company had targeted 97 or 98 percent occupancy rates in markets where it was a leader.  After outsourcing rent prices to the algorithm, the company began targeting three to four percent revenue growth while operating at a 95 percent occupancy rate.[51]

67.    The RealPage Platform not only facilitates price hikes, but it also allows conspirators to *maintain* higher prices.  RealPage claims that Defendant property managers and their co-conspirators were able to maintain rent prices 7 percent above the competitive market rate.  Speaking at a RealPage webcast, America Melragon, a former VP of revenue management for IRT, discussed how property managers can stabilize rents by using RealPage's software.  According to Melragon, "We've noticed . . . competitors that are manually pricing have already started to experience pretty significant swings in their effective price . . . For us, really having

---

[49] *See Introducing AI Revenue Management*, *supra* note 42.

[50] Vogell, *supra* note 1.

[51] *Id.*

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

that insight into our own individual supply and demand exposure has helped our price pretty much stay in line with where we anticipated it to be."[52]

68.     Defendants and their co-conspirators are aware that the higher revenues they obtain using RealPage's software are the result of increasing average rent prices in the neighborhoods they serve.  In a video shown at a conference for real estate executives in the summer of 2021, RealPage vice president Jay Parsons noted that average rents had recently shot up by 14 percent.  Another RealPage executive explained that the RealPage Platform was driving this growth.  *See supra* at ¶ 13.

69.     Defendants' conspiracy allows property managers to hike rents even higher when demand is strong without needing to lower them when it is weak.  It untethers rent prices from their natural constraints, forcing renters to spend more money than they would have in a competitive rental

### E.     "Plus Factors" In The Residential Market Provide Additional Evidence Of A Price Fixing Conspiracy

70.     Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[53]  Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism.  The factors that provide the most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."[54]

---

[52] *IRT Gains Pricing Stability with RealPage Revenue Management*, RealPage Videos (June 17, 2020), https://www.realpage.com/videos/irt-gains-pricing-stability/ (last accessed Nov. 22, 2022).

[53] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

[54] *See id.* at 396-97.

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

71.     Here, several plus and super plus factors support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel.  These include (i) Defendants' exchange of competitively sensitive information, (ii) the presence of a price-verification scheme, (iii) a motive to conspire, (iv) opportunities and invitations to collude, (v) high barriers to entry, (vi) high switching costs for renters, (vii) high market concentration, (viii) stability in the market shares of large residential apartment managers, and (ix) maintenance of excess capacity during periods of rising prices.

72.     **First**, the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[55]  As described above, RealPage requires client property managers to input data on actual rents paid and occupancy rates, along with detailed records of lease transactions.  This data, which would normally be kept private, is fed into the algorithm which sets coordinated rents among competing property managers.  Importantly, individual property managers would be competitively disadvantaged by providing private data to other property managers unilaterally, and rational actors will only do so with the expectation that they will benefit from similar private information shared by their competitors.

73.     **Second**, RealPage provides participating property managers with a price-verification scheme.  As described above, RealPage pushes its clients to accept the algorithm's rent price at least 80-90 percent of the time and clients cannot freely diverge from the algorithm's price.  This type of price-verification makes little sense absent collusion.[56]

74.     **Third**, RealPage provides property managers with a motive to conspire by advertising its software and claiming it can increase revenue by 3 to 7 percent.[57]

75.     **Fourth**, the RealPage Platform itself is an opportunity to coordinate prices that was previously unavailable, and RealPage's advertisements are naked invitations to collude.

---

[55] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

[56] *Id.* at 1602.

[57] *See* RealPage Inc., *Proven in any Market Cycle*, *supra* note 17, at 6.

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Additionally, RealPage hosts online forums and in-person conferences for property managers[58] and maintains standing committees of cartel members to advise on pricing strategy,[59] all of which provide opportunities for more direct collusion.

76.     **Fifth**, the market for residential apartment rentals is highly concentrated. Desirable neighborhoods in many major cities are dominated by large corporate property managers, such as Greystar and Camden, which are themselves increasingly controlled by even larger private equity firms.[60]  For example, ProPublica found that in one popular Seattle neighborhood, 70 percent of the apartments were managed by just 10 property managers, all of which were using the RealPage Platform.[61]

77.     **Sixth**, multifamily residential building owners and operators face significant entry barriers.  These include the high cost of acquiring property and establishing a property management infrastructure as well as ongoing costs of building maintenance and regulatory compliance.  Even small multifamily rental properties cost millions of dollars to acquire.  Larger properties run into the hundreds of millions of dollars to own and manage and take several years and significant experience to build or acquire.  Thus, new entrants into the residential real estate leasing market are unlikely to discipline cartel pricing.

78.     **Seventh**, there are significant switching costs that prevent effective price competition in rental markets.  In other markets with low switching costs, consumers can stop purchasing a particular manufacturer's product when its prices are no longer competitive.  Rental contracts, however, are usually for a term of at least one year.  Renters who break their lease during the rental term will likely face significant financial penalties for doing so.  These penalties may include, among other things: the forfeiture of a security deposit (typically at least one month's rent), or the requirement that the renter continue paying rent until the property is

---

[58] *See The Pursuit of Excellence*, *supra* note 5.

[59] *See User Group Overview*, *supra* note 5.

[60] Heather Vogell, *When Private Equity Becomes Your Landlord*, ProPublica (Feb. 7, 2022), https://www.propublica.org/article/when-private-equity-becomes-your-landlord (last accessed Nov. 22, 2022).

[61] Vogell, *supra* note 1.

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

released.  Because of these high switching costs, renters cannot readily switch from one rental unit to another in the event their current rental unit no longer aligns with market prices.  This creates a certain degree of natural market power for owners of rental properties and makes collusion more effective because even if a competing property manager were to offer lower prices on available units, customers will not typically break their leases to enter a lease for a lower cost property given the substantial cost of doing so.

79.  **Eighth**, the relative market share held by the largest residential apartment managers has been remarkably stable.  Since 2018, the list of the top 10 apartment managers in the country has been virtually identical, with a total of 13 companies appearing on the combined list.  The small variance is due largely to the merger between two of the top five apartment managers in 2020.[62]  Stability of relative market shares indicates a market that lacks dynamic competition.

80.  **Finally**, RealPage's clients maintain excess capacity while simultaneously raising prices.  As described above, the ability of RealPage's clients to increase their revenue depends on them continuing to raise rental prices while simultaneously maintaining a higher vacancy rate than they would have independently.  This is evidence of collusion because in a competitive market, firms with surplus inventory normally reduce prices to grow market share.[63]  As described above, RealPage and its clients are open about how they can achieve higher revenues while maintaining a lower occupancy rate than they could setting prices independently.

## V.  CLASS ALLEGATIONS

81.  Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

---

[62] *NMHC 50 Largest Apartment Managers*, Multifamily Housing Council, https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2022-top-managers-list/ (2022); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2021-top-manager-list/ (2021); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2020-top-managers-list/ (2020); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2019-managers-list/ (2019); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2018-manager-list/ (2018) (all cites last accessed Nov. 23, 2022).

[63] *See* Leslie, *supra* note 55, at 1606.

CLASS ACTION COMPLAINT - 24
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

82.     Plaintiffs brings this action on behalf of themselves and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Classes:

**Nationwide Class:**  All persons and entities in the United States and its territories that directly leased at least one multifamily residential property from a Lessor Defendant, or from a division, subsidiary, predecessor, agent, or affiliate of such Lessor Defendant, that uses the RealPage Platform from January 1, 2016 until the anticompetitive effects of Defendants' unlawful conduct ceased.

**North Carolina Subclass:** All persons and entities in North Carolina that directly leased at least one multifamily residential property from a Lessor Defendant, or from a division, subsidiary, predecessor, agent, or affiliate of such Lessor Defendant, that uses the RealPage Platform from January 1, 2016 until the anticompetitive effects of Defendants' unlawful conduct ceased.

**Florida Subclass:** All persons and entities in Florida that directly leased at least one multifamily residential property from a Lessor Defendant, or from a division, subsidiary, predecessor, agent, or affiliate of such Lessor Defendant, that uses the RealPage Platform from January 1, 2016 until the anticompetitive effects of Defendants' unlawful conduct ceased.

(Collectively, "the Class")

83.     Subject to additional information obtained through discovery and further investigation, the foregoing class definitions may be expanded, narrowed, or otherwise modified.

84.     Excluded from this Class are the Defendants and Co-Conspirators, their parent companies, the officers, directors or employees of any Defendant, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies, and instrumentalities.  Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

85.     **Numerosity.**  The Class is so numerous and geographically dispersed throughout the United States that the joinder of all members of the Class ("Class Members") is impracticable.  While Plaintiffs do not know the exact number and identity of all Class Members,

CLASS ACTION COMPLAINT - 25
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   Plaintiffs are informed and believes that there are millions of members in the Class.  The precise

2   number of Class Members can be ascertained through discovery.

3        86.   **Existence and predominance of common questions of law and fact.**  Common

4   questions of law and fact exist as to all Class Members and predominate over any questions

5   affecting only individual Class Members.  This is particularly true given the nature of

6   Defendants' conspiracy, which was generally applicable to all Class Members, thereby making

7   appropriate relief with respect to the Class as a whole.  Questions of law and fact common to the

8   Class include, but are not limited to, the following:

9        (a)   Whether Defendants have entered into a formal or informal contract, combination,

10            conspiracy, or common understanding to artificially inflate the rental price and/or

11            artificially suppress the supply of multifamily residential property leases from

12            competitive levels;

13       (b)   Whether Defendants unjustly enriched themselves to the detriment of Plaintiffs

14            and the Class, thereby entitling Plaintiffs and the Class to disgorgement of all

15            benefits derived by the Defendants;

16       (c)   If Defendants entered into such a formal or informal contract, combination,

17            conspiracy, or common understanding, whether that conduct violates the Sherman

18            Act;

19       (d)   If Defendants entered into such a formal or informal contract, combination,

20            conspiracy, or common understanding, whether that conduct has in fact artificially

21            inflated price and/or artificially suppressed supply of multifamily residential

22            property leases from competitive levels;

23       (e)   The appropriate injunctive and related equitable relief for the Class; and

24       (f)   The proper measure of damages.

25       87.   **Typicality.**  Plaintiffs' claims are typical of the claims of Class Members.

26  Plaintiffs and the Class have been injured by the same wrongful practices of Defendants.

27  Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of the

28  Class and are based on the same legal theories.

CLASS ACTION COMPLAINT - 26
Case No.
011127-11/2087382 V1

88.     **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of the Class and have no interests antagonistic to those of the other Class Members. Plaintiffs have retained attorneys experienced in antitrust class actions and complex litigation as counsel.

89.     **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class Members are relatively small compered to the burden and expense of individual litigation of their claims against Defendants.  The class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## VI.     ANTITRUST INJURY

90.     Defendants' anticompetitive conduct had the following effects, among others:

(a)     Competition among Defendants has been restrained or eliminated with respect to residential rental units;

(b)     The price of residential rental units has been fixed, stabilized or maintained at artificially high levels; and

(c)     Individuals have been deprived of free and open competition.

91.     Defendants' violations of the antitrust laws have caused Plaintiffs and the Class to pay higher prices for residential rental units than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages in the form of overcharges paid on their rental units.

92.     This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VII.     FRAUDULENT CONCEALMENT

93.     Plaintiffs and Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief.  Plaintiffs and Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the

CLASS ACTION COMPLAINT - 27
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix residential rental unit prices.

94.     The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, sharing non-public data via the RealPage Platform, secret meetings, surreptitious communications between Defendants by the use of telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor or supply restraint and price discussions from non-conspirators. The conspiracy was by its nature self-concealing.

95.     Throughout the Class Period set forth in this Complaint, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and Class Members.

96.     The residential rental market is not exempt from antitrust regulation, and thus, before October 15, 2022, when ProPublica published the article "Rent Going Up? One Company's Algorithm Could Be Why.," Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' rental practices.

97.     Plaintiffs exercised reasonable diligence. Plaintiffs and Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

98.     By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

CLASS ACTION COMPLAINT - 28
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**COUNT I**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)**

99.     Plaintiffs hereby incorporate by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

100.     Plaintiffs bring this claim individually and on behalf of the Class Members against all Defendants.

101.     Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2016 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

102.     The acts done by Defendants as part of, and in furtherance of, its and its co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

103.     From at least January 1, 2016, until the anticompetitive effects of Defendants' unlawful conduct ceased ("Class Period"), Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, or stabilize the rental prices for multifamily residential property leases, thereby creating anticompetitive effects.

104.     The anticompetitive acts were intentionally directed at the United States market for multifamily residential property leases and had a substantial and foreseeable effect on interstate commerce by fixing, raising, or stabilizing the rental prices for multifamily residential property leases throughout the United States.

105.     The conspiratorial acts and combinations have caused unreasonable restraints on the market for multifamily residential property leases in the United States.

106.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated persons in the Class who leased multifamily residential property have been harmed by

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    being forced to pay inflated, supra-competitive rental prices for multifamily residential property

2    leases.

3         107.    In formulating and carrying out the alleged agreement, understanding and

4    conspiracy, Defendants and their co-conspirators did those things that they combined and

5    conspired to do, including but not limited to the acts, practices and course of conduct set forth

6    herein.

7         108.    Defendants and their co-conspirators' conspiracy had the following effects,

8    among others:

9         (a)     Price competition in the market for multifamily residential property leases has

10                been restrained, suppressed, and/or eliminated in the United States;

11        (b)     Prices for multifamily residential property leases leased by Lessor Defendants and

12                their co-conspirators have been fixed, raised, maintained, and stabilized at

13                artificially high, non-competitive levels throughout the United States; and

14        (c)     Plaintiffs and Class Members who leased multifamily residential property leases

15                from Lessor Defendants and their co-conspirators have been deprived of the

16                benefits of free and open competition.

17        109.    Plaintiffs and Class Members have been injured and will continue to be injured in

18   their business and property by paying more for multifamily residential property leases leased

19   from Lessor Defendants and their co-conspirators than they would have paid and will pay in the

20   absence of the conspiracy.

21        110.    The alleged contract, combination, or conspiracy is a *per se* violation of the

22   federal antitrust law or, alternatively, a violation of federal antitrust law under either a quick look

23   or rule of reason analysis.

24        111.    Plaintiffs and Class Members are entitled to an injunction against Defendants,

25   preventing and restraining the violations alleged herein.

26                                    **COUNT II**

27   **VIOLATIONS OF NORTH CAROLINA GENERAL STATUTES §§ 75-1 *ET SEQ*.**

28        112.    Plaintiffs hereby incorporate by reference and re-alleges herein the allegations

CLASS ACTION COMPLAINT - 30
Case No.
011127-11/2087382 V1

contained in all preceding paragraphs of this complaint.

113.    The North Carolina Plaintiff brings this claim individually and on behalf of the North Carolina Class against all Defendants.

114.    Defendants violated North Carolina Gen. Stat. §§ 75-1 *et seq*., including § 75-2.1.

115.    Defendants' conduct at issue here had the following effects: (1) it restrained, suppressed, and eliminated rental price competition in North Carolina; (2) rental rates were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) North Carolina Plaintiff and members of the North Carolina Class were deprived of free and open competition; and (4) North Carolina Plaintiff and members of the North Carolina Class paid supra-competitive, artificially inflated rents.

116.    During the Class Period, Defendants' conduct at issue here substantially affected North Carolina commerce.

117.    As a Direct and proximate result of Defendants' conduct, North Carolina Plaintiff and members of the North Carolina Class were injured in their business and property and are threatened with further injury.

118.    Accordingly, North Carolina Plaintiff and members of the North Carolina Class seek all relief available under North Carolina Gen. Stat. §§ 75-1 *et seq*.

## COUNT III

### VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), FLA. STAT. § 501.201 *ET SEQ.*

120.    Plaintiffs hereby incorporate by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

121.    The Florida Plaintiff brings this claim individually and on behalf of the Florida Class Members against all Defendants.

122.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*.

123.    Defendants' conduct at issue here had the following effects: (1) it restrained,

CLASS ACTION COMPLAINT - 31
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

suppressed, and eliminated rental price competition in Florida; (2) rental rates were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Florida Plaintiff and members of the Florida Class were deprived of free and open competition; and (4) Florida Plaintiff and members of the Florida Class paid supra-competitive, artificially inflated rents.

124.   Defendants concealed, suppressed, and omitted to disclose materials facts to Florida Plaintiff and members of the Florida Class concerning Defendants' unlawful activities and artificially inflated rental rates. The concealed, suppressed, and omitted facts would have been important to Florida Plaintiffs and members of the Florida Class as they related to their rental rates.

125.   Defendants' omissions and conduct were deceptive as they had the tendency or capacity to mislead Florida Plaintiff and members of the Florida Class to believe that their rental amount was established by a free and fair market.

126.   During the Class Period, Defendants' conduct at issue here substantially affected Florida commerce.

127.   As a direct and proximate result of Defendants' conduct, Florida Plaintiff and members of the Florida Class were injured in their business and property and are threatened with further injury.

128.   Accordingly, Florida Plaintiff and members of the Florida Class seek all relief available under Fla. Stat. §§ 501.201 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully requests that:

A.   Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

Hagens Berman Sobol Shapiro LLP
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

B.      The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or full-fledged rule of reason violation) of the statutory causes of action alleged here;

C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and Class Members for treble the amount of damages sustained by Plaintiffs and the Class Members as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.      The Court award Plaintiffs and Class Members such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

### JURY TRIAL DEMAND

Plaintiffs demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all claims so triable.

CLASS ACTION COMPLAINT - 33
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   Dated: December 6, 2022                    Respectfully submitted,

2                                              By:   */s/ Steve W. Berman*
                                                   Steve W. Berman, WSB# 12536
3                                              By:   */s/ Breanna Van Engelen*
4                                                  Breanna Van Engelen, WSB #49213
                                               HAGENS BERMAN SOBOL SHAPIRO LLP
5                                              1301 Second Avenue, Suite 2000
                                               Seattle, Washington 98101
6                                              Telephone: (206) 623-7292
                                               Facsimile: (206) 623-0594
7                                              steve@hbsslaw.com
8                                              breannav@hbsslaw.com

9                                              *Local Counsel for Plaintiffs*

10                                             Joel D. Smith *
                                               Brittany S. Scott *
11                                             **BURSOR & FISHER, P.A.**
                                               1990 North California Blvd., Suite 940
12                                             Walnut Creek, CA  94596
                                               Telephone:  (925) 300-4455
13                                             Facsimile:  (925) 407-2700
                                               Email: jsmith@bursor.com
14                                                    bscott@bursor.com

15                                             *Attorneys for Plaintiffs*
16                                             * *Pro Hac Vice Application Forthcoming*

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT - 34
Case No.
011127-11/2087382 V1

Hagens Berman Sobol Shapiro LLP
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594